**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JRS PARTNERS, GP; JRT REVOCABLE TRUST; SFT REVOCABLE TRUST; PBO 2012 IRREVOCABLE TRUST; GLENN B. HOPPER III, WILLIAM PATRICK ORTALE III** | ) ) ) ) ) ) | **Civil Action No. _____** |
| **Plaintiffs,** | ) ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **v.** | ) ) | |
| **CHRIS WARREN; CLEAN ENERGY ADVISORS, LLC; CEA UTILITY INCOME FUND, LLC; CEA HOLDINGS UTILITY SOLAR IV, LP; SCOTT HILL; JACK VITALE** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

_____

## COMPLAINT
_____

The Plaintiffs, individual investors acting on their own behalf, and on behalf of entities which they managed the investment decisions for, made certain investments in two purported investment funds run by defendants Clean Energy Advisors ("CEA") and Chris Warren. Based on facts now discovered by the Plaintiffs, and set forth below, these investments were solicited and procured through false and fraudulent representations. As plaintiffs have now discovered, the two investment funds are entirely fictitious, and Plaintiffs are at immediate risk of losing all the funds they invested. In support of these claims, Plaintiffs state as follows:

# I. NATURE AND STATUTORY BASIS OF ACTION

1. This is an action on behalf of purchasers of securities promoted and sold unlawfully by Clean Energy Advisors, LLC ("CEA") and the other Defendants.

2. The securities promoted and sold by the Defendants included partnership and/or membership interests in CEA Holdings Utility Solar Fund IV, LP ("Solar IV") and CEA Utility Income Fund, LLC ("UIF") (collectively, the "Funds").

3. By and through Solar IV and UIF, the Defendants facilitated the fraudulent sale of securities to the Plaintiffs.

4. The Plaintiffs are pursuing remedies against the Defendants under the Securities Act of 1933 and the regulations promulgated thereunder (the "Securities Act"), the Securities Exchange Act of 1934 and the regulations promulgated thereunder (the "Exchange Act"), the Tennessee Securities Act of 1980 and the regulations, rules, and orders promulgated thereunder (the "Tennessee Securities Act"), and Tennessee common-law and equitable causes of action.

## II. PARTIES

### A. Plaintiffs

5. JRS Partners, GP is a Tennessee general partnership that purchased interests in UIF. During all times relevant to this Complaint, JRS Partners was an accredited investor (as defined by Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission). At all times relevant to this Complaint, JRS Partners GP was managed by John "Jack" R. Tyrrell ("Mr. Tyrrell").

6. The John Ryan Tyrrell Revocable Trust ("JRT Revocable Trust"), Jack Tyrrell, Trustee, a resident of Nashville, Tennessee, purchased interests in Solar IV and UIF. During all times relevant to this Complaint, the JRT Revocable Trust was an accredited investor (as defined

by Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission).  At all times relevant to this Complaint, Mr. Tyrrell served as the trustee and made all investment decisions for the JRT Revocable Trust.

7.  The Sandra F. Tyrrell Revocable Trust ("SFT Revocable Trust"), Sandra F. Tyrrell, Trustee, a resident of Nashville, Tennessee, purchased interests in Solar IV. During all times relevant to this Complaint, the SFT Revocable Trust was an accredited investor (as defined by Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission).  At all times relevant to this Complaint, Mr. Tyrrell made all investment decisions for the SFT Revocable Trust.

8.  William "Pat" Patrick Ortale III, a resident of Nashville, Tennessee, purchased interests in Solar IV and UIF. During all times relevant to this Complaint, Pat Ortale was an accredited investor (as defined by Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission).

9.  The Portia B. Ortale 2012 Irrevocable Trust ("PBO Trust"), William Patrick Ortale III, Trustee, a resident of Tennessee, purchased interests in Solar IV and UIF. During all times relevant to this Complaint, the PBO Trust was an accredited investor (as defined by Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission).  At all times relevant to this Complaint, Mr. Ortale made all investment decisions for the PBO Trust.

10.  Glenn B. Hopper III, a resident of Lebanon, Tennessee, purchased interests in UIF. During all times relevant to this Complaint, Glenn Hopper was an accredited investor (as defined by Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission).

## A. Defendants

11.     Christopher "Chris" Warren is an individual and, on information and belief, a resident of Anthony, Florida.  At various times relevant to the transactions referenced in this Complaint, Mr. Warren served as the Chief Executive Officer/Chief Investment Officer of Defendant Clean Energy Advisors, LLC ("CEA").  For federal and state securities law purposes, Mr. Warren was a promoter, executive officer, and director with respect to certain of the offerings conducted the Funds.

12.     Clean Energy Advisors, LLC is a Wyoming Limited Liability Company.  During all times relevant to the transactions referenced in this Complaint, the principal place of business of CEA was 1621 Central Ave., Cheyenne, WY 82001.  During all times relevant to the transactions referenced in this Complaint, CEA was the General Partner of Solar IV and the Manager of UIF. As the General Partner and Manager of the Funds, CEA had all management authority to perform one or more of construction, operation, development and management services, including incurring and paying expenses directly and indirectly related to the solar projects, selling electricity produced from the solar projects, and distributing proceeds from the sale of electricity produced from the solar projects to the Plaintiffs.

13.     CEA Holdings Utility Solar Fund IV, LP ("Solar IV") is a Wyoming Limited Partnership. During all times relevant to the transactions referenced in this Complaint, the principal place of business of Solar IV was 1621 Central Ave., Cheyenne, WY 82001.

4840-4710-0751.6

14.    CEA Utility Income Fund, LLC  ("UIF")[1] is a Delaware Limited Liability Company. During all times relevant to the transactions referenced in this Complaint, the principal place of business of UIF was 810 Dominican Dr., Impact 2.5, Nashville, TN 37228.

15.    Scott Hill is an individual and, on information and belief, a resident of Williamson County, Tennessee. At various times relevant to the transactions referenced in this Complaint, Mr. Hill was the Chief Business Development Officer of CEA.  For federal and state securities law purposes, Mr. Hill was a promoter, executive officer, and director with respect to certain of the offerings conducted the Funds.

16.    Jack Vitale is an individual who, on information and belief, is a resident of Emerald Isle, North Carolina.  At various times relevant to the transactions referenced in this Complaint, Mr. Vitale served as the Chief Financial Officer of CEA.  For federal and state securities law purposes, Mr. Vitale was a promoter, executive officer, and director with respect to certain of the offerings conducted the Funds.

### III.  JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction over the claims herein pursuant to 28 U.S.C. § 1331 because the Plaintiffs' claims arise under the laws of the United States, specifically the Securities Act of 1933, 15 U.S.C. § 77a *et. seq*. and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et. seq*.  This Court has supplemental jurisdiction over all other claims herein pursuant to 28 U.S.C. § 1367 because said claims are so related to the federal claims that they form part of the same case or controversy.

18.    Venue is proper in this Court because the Defendants transacted business in this district; a substantial part of the events, misrepresentations, inconsistent statements, and omissions giving rise to the Plaintiffs' claims occurred in this district; one or more of the offers

---

[1] Both Solar IV and UIF are collectively referred to as the "Funds."

4840-4710-0751.6

and sales of securities took place in this district. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), 15 U.S.C. § 77v.

## IV.  FACTUAL BACKGROUND

**A.      The Creation of the Funds**

19.     Upon information and belief, Mr. Warren, Mr. Hill, and Mr. Vitale, constructed CEA and the Funds as part of a concerted scheme to defraud investors.

20.     As represented by Defendants, each of the Funds was created to design, build, and operate utility scale solar photovoltaic ("PV") projects in the State of North Carolina and in other various states throughout the country.

21.     Each of the Funds would purportedly take advantage of investment tax credits that were then available for the construction of renewable energy products.  The Funds would also enter into long-term power purchase agreements with various power companies, including Duke Energy.  By doing so, the Funds offered predictable tax-free rates of return.

22.     Despite these representations, however, at no point did either of the Funds embark upon the investment strategies they purported to utilize, including building and developing solar PV projects or entering into long-term power purchase agreements.  Instead, Mr. Warren, Mr. Hill, and Mr. Vitale, used all investments they solicited for the Funds for other unknown purposes, including, on information and belief, their own personal enrichment.

23.     In order to affect their scheme, as described below, Defendants offered and sold interests in the Funds, in the amounts set forth below, through general solicitations to prospective investors, including Plaintiffs, with whom the Defendants did not have a prior relationship; through printed materials; and through the distribution of private offering memorandums (collectively the "Offerings").

### 1. Solar IV

24.　On or about January 27, 2014, CEA caused to be issued, or participated in the issuance of, a private offering memorandum ("POM") offering investments in Solar IV, a Wyoming limited partnership formed for the purported purpose of investing and constructing fifteen (15) utility scale solar PV projects located in North Carolina, Texas, California and Missouri.　A true and accurate copy of the Solar IV POM that was provided to Plaintiffs is attached to the accompanying Evidentiary Appendix as **Exhibit 1.**[2]

25.　As the offering memorandum stated, the electricity produced by the solar PV projects was to be sold to local utility companies under long-term power purchase agreements. The PPAs were to be at a fixed rate for a minimum of fifteen (15) years. The Plaintiffs have never been provided, and have never seen, copies of any power purchase agreements.

26.　As its offering memorandum set forth, Solar IV stated it would make quarterly distributions to the Plaintiffs throughout the first eight (8) years of the project, at which point Plaintiffs would begin to receive an annual distribution.

27.　The offering memorandum provided that the investors in Solar IV were to be advised at the end of each fiscal quarter as to the operation of the Partnership, and the books and records were to be audited at the end of each fiscal year by a certified public accountant chosen by CEA.

28.　CEA issued and sold Securities in the form of limited partnership Interests in Solar IV to certain of the Plaintiffs for investments in Solar IV.

---

[2] Plaintiffs have combined all exhibits related to this Complaint in an Evidentiary Appendix, being filed contemporaneously with this Complaint.

4840-4710-0751.6

29.     The JRT Revocable Trust purchased interests in Solar IV totaling $1,000,000.00. A true and accurate copy of the JRT Revocable Trust Solar IV subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 2.**

30.     The SFT Revocable Trust purchased interests in Solar IV totaling $1,000,000.00. A true and accurate copy of the SFT Revocable Trust Solar IV subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 3.**

31.     Mr. Ortale purchased interests in Solar IV totaling $500,000.00. A true and accurate copy of Mr. Ortale's Solar IV subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 4.**

32.     The PBO Trust purchased interests in Solar IV totaling $500,000.00 A true and accurate copy of the Portia B. Ortale 2012 Irrevocable Trust Solar IV subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 5.**

   **2.  UIF**

33.     On or about April 1, 2015 CEA caused to be issued, or participated in the issuance of, a private offering memorandum ("POM") offering investments in UIF, a Delaware LLC formed for the purported purpose of investing and constructing utility scale solar PV projects in various locations within the United States. A true and accurate copy of the UIF POM and the UIF LLC Operating Agreement are attached to the accompanying Evidentiary Appendix as **Exhibit 6 and Exhibit 7,** respectively.

34.     As with Solar IV, the UIF offering documents stated that the fund would design, build, and operate various solar PV projects in locations across the United States.  The electricity produced by the solar PV projects was to be sold to local utility companies under long-term Power Purchase Agreements ("PPA"). The PPAs were to be at a fixed rate for a minimum of ten

(10) years. The Plaintiffs were never provided with, and never saw copies of, any power purchase agreements.

35.     UIF was also to make distributions to the Plaintiffs as a return of capital, until all invested capital had been returned to members.

36.     As with Solar IV, UIF's offering documents represented that investors were to be advised at the end of each fiscal quarter as to the operation of the Partnership, and the books and records were to be audited at the end of each fiscal year by a certified public accountant chosen by CEA.

37.     CEA issued and sold Securities in the form of LLC Interests to each of the Plaintiffs, with the exception of the SFT Revocable Trust, for investments in UIF.

38.     JRS Partners, GP purchased interests in Solar IV totaling $6,000,000.00.[3] A true and accurate copy of the JRS Partners, GP Solar IV subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 8.**  Mr. Tyrrell caused JRS Partners, GP to make an additional purchase of interests totaling $1,250,000.00 on December 21, 2016, and was told by Mr. Warren that he would receive a subscription agreement and certificate of interest.[4] Neither were provided.

39.     The JRT Revocable Trust purchased interests in UIF totaling $2,000,000.00.[5] A true and accurate copy of the JRT Revocable Trust UIF subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 9.** Mr. Tyrrell caused the JRT Revocable Trust to make an additional purchase of interests totaling $750,000.00 on December 21, 2016, and was

---

[3] Although the interests supposedly carried a par value of $6,000,000.00, JRS Partners, GP purchased the interests for $5,700,000.00.
[4] Although the interests supposedly carried a par value of $1,250,000.00, JRS Partners, GP purchased the interests for $1,187,500.00.
[5] Although the interests supposedly carried a par value of $2,000,000.00, the JRT Revocable Trust purchased the interests for $1,900,000.00

told by Mr. Warren that he would receive a subscription agreement and certificate of interest.[6] Neither were provided.

40. William "Pat" Patrick Ortale III purchased interests in UIF totaling $500,000.00. A true and accurate copy of Mr. Ortale's UIF subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 10.**

41. The PBO Trust purchased interests in UIF totaling $2,000,000.00. A true and accurate copy of the PBO Trust UIF subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 11.**

42. Glenn B. Hopper purchased interests in UIF totaling $1,200,000.00. A true and accurate copy of Mr. Hopper's UIF subscription agreement is attached to the accompanying Evidentiary Appendix as **Exhibit 12.**

**B.      The Defendants' Fraudulent Scheme**

43. By and through the Offerings, the Defendants intentionally orchestrated and executed a conspiracy and scheme to defraud and deprive the Plaintiffs of money by selling interests in the Funds to the Plaintiffs under the guise that the Funds would be used to construct and operate multiple utility scale solar PV projects, which they were not.

44. As set forth above, each of the Funds' offering memorandums stated that investments would be used to further the design, construction, and operation of solar PV projects.  *See* Exhibits 1 and 6 to the Evidentiary Appendix.

45. Each of the Funds' offering memorandums further stated that the Funds would enter into power purchase agreements with utility companies for the sale of power produced by the solar PV projects built by the Funds.  *See* Exhibits 1 and 6 to the Evidentiary Appendix.

---

[6] Although the interests supposedly carried par value of $750,000.00, the JRT Revocable Trust purchased the interests for $712,500.00.

46.     As described below, Plaintiffs also had extensive conversations with Mr. Warren, Mr. Hill, and Mr. Vitale prior to investing. Plaintiffs relied on the representations made in these discussions in their decisions to invest.

47.     Mr. Warren represented to the Plaintiffs that he had a great deal of experience in the solar industry and had built and developed solar power projects in North Carolina for many years.  He stated that once Solar IV or UIF built a solar energy project it would enter into a long term power purchase agreement with local utility companies, which would provide a defined income stream over a period of at least fifteen (15) to twenty-five (25) years, depending on the agreement.

48.     Mr. Warren also represented that the Plaintiffs would be able to take advantage of investment tax credits as a result of investing in renewable energy projects.

49.     Mr. Warren also represented that Travelers Insurance was providing a "wrap" insurance policy for all of the solar fields, which would guarantee that there would be no interruption or decrease in the streams of payment from the power purchase agreements.

50.     Mr. Warren stated that the Solar IV investors should expect to receive quarterly distributions equal to an 8% tax-free annualized rate on investment for the first seven (7) years because of the revenues that would be generated from the power purchase agreements and the solar tax credit available to investors under federal tax law. After seven years, Mr. Warren stated, quarterly distributions would continue at 8% annualized, but would become taxable and could increase to 10%. He also said that half of the Plaintiffs' initial investment in Solar IV would be returned in years eight through ten, and that the remaining half of the investments would be returned over the following ten years. Mr. Warren represented that, even though principal would

have been returned, the 8% to 10% distributions would continue through at least year twenty (20).

51.     After recognizing a substantial cash influx following the sale of a business, Plaintiffs JRS Partners, GP and the JRT Revocable Trust looked to make additional investments with CEA. Mr. Warren advised Solar IV was closed to further investments, but that CEA was opening a new fund – UIF.  He said this fund had the same tax benefits as Solar IV, including the investment tax credit for investing in renewable energy projects.  The only difference between the Funds, Mr. Warren represented, was that UIF would have carried interest and be able to use leverage.

52.     The Plaintiffs also spoke with Mr. Hill and Mr. Vitale during the due diligence period.

53.      Mr. Hill's discussions with Mr. Tyrrell in 2014 and 2015 reiterated the representations Mr. Warren had made. Mr. Hill discussed the plan to create solar PV projects in North Carolina, the economics of building the projects, selling electricity through power purchase agreements, and the availability of projects to be taken over from other developers.

54.     Mr. Vitale, in his October 20, 2014 conversation with Mr. Tyrrell, represented that he had many years of successful real estate investments with Mr. Warren, that he believed Mr. Warren to be honest and hardworking, and that he had personally vetted Mr. Warren through accountants, lawyers and other professionals, getting positive feedback from each.

   **1.  Plaintiffs Learn of the Fraud**

55.     The Funds paid the regularly scheduled distributions as required from the date of their original investment in each of the Funds through the first quarter of 2017.  Plaintiffs were in regular contact with Mr. Warren and were aware of no issues.

56.     On or about April 25, 2017, Mr. Warren asked Mr. Ortale and Mr. Tyrrell to travel to Orlando to meet with him and discuss the UIF fund.  Mr. Warren represented that he wanted Mr. Tyrrell and Mr. Ortale to see CEA's operations and discuss how best to deploy new capital raised by UIF.

57.     Upon arriving in Orlando, Mr. Tyrrell and Mr. Ortale traveled to CEA's offices and met with Mr. Warren.  Mr. Warren described the amount of capital raised thus far by UIF, and discussed with Mr. Tyrrell and Mr. Ortale how he planned to use it to build additional solar PV projects.

58.     At no time during this meeting did Mr. Warren state that there were any problems with the Funds or CEA or otherwise suggest that the investments were not performing as represented in the offering memorandums.

59.     Prior to the Orlando meeting, Mr. Warren also provided Mr. Ortale and Mr. Tyrrell a copy of a purported audit letter issued by the accounting firm CohnReznick.  A true and accurate copy of the purported CohnReznick Audit Letter is attached to the accompanying Evidentiary Appendix as **Exhibit 13.**

60.     After returning from Orlando, Mr. Ortale and Mr. Tyrrell provided a copy of the CohnReznik letter to their accountants.  Their accountants immediately took issue with the use of the term "Generally Accepted Government Auditing Standards (GAGAS)."  This term, created by the Government Accountability Office applies only to the performance audits of government agencies, has no relation to the financial performance of any private investment fund such as the Funds.

61.     Upon being alerted of this information, Mr. Ortale contacted CohnReznik in Charlotte, North Carolina.  Mr. Ortale eventually spoke with a member of CohnReznik's general

counsel's office who informed him that the firm has no record of ever performing an audit of UIF or having CEA as a client. Michelle Fleishman, CohnReznik's general counsel, sent an email on May 17, 2017, confirming this fact. A true and accurate copy of the email from Ms. Fleishman is attached to the accompanying Evidentiary Appendix as **Exhibit 14.**

62. The fraudulent nature of the purported CohnReznik audit letter not only amounts to a fraudulent representation by Mr. Warren, CEA, and the Funds, but it also puts the UIF fund in breach of its POM to provide a yearly audited financial statement.

63. As Plaintiffs were preparing to confront Mr. Warren about this fraudulent audit letter, they began to realize the true nature of the fraudulent scheme. On May 5, 2017 Plaintiffs JRT Revocable Trust and the SFT Revocable Trust received victim notification letters from the Federal Bureau of Investigation ("FBI") which stated that the Trusts had been identified "as a possible victim of crime."

64. The other Plaintiffs also received victim notification letters in the following weeks. A true and accurate copy of the FBI victim notification letters are attached to the accompanying Evidentiary Appendix as collective **Exhibit 15.**

65. Following the receipt of these letters, Mr. Tyrrell and Mr. Ortale contacted the FBI field office in Nashville. At the request of the FBI, both Mr. Tyrrell and Mr. Ortale met with agents from the FBI's Nashville Field Office on May 23, 2017.

66. During the course of that meeting, the FBI agents stated that they were investigating Mr. Warren, CEA, and the Funds.

67. The agents asked both Mr. Tyrrell and Mr. Ortale about the due diligence they had performed prior to their investments including whether either had traveled to any of the solar developments that Mr. Warren and the Funds' offering documents had stated were constructed.

They also showed Mr. Tyrrell and Mr. Ortale pictures of solar developments near, but not at, these specific addresses and asked them whether they recognized any of company names on the signs indicating ownership of the projects in those pictures. In doing so, the agents suggested that there were no developments located at the addresses of the purported developments owned by the Funds. While there were developments near these addresses, they did not appear to be owned by either of the Funds or CEA. The agents further suggested that the inconsistencies of the addresses could be the result of an individual using a satellite mapping service, such as Google Maps, to determine the address of solar developments that appeared on those maps.

68.     In talking with Mr. Ortale one of the agents stated that it did not appear that Solar IV had $60 million in investments as Mr. Warren had repeatedly represented to both Mr. Tyrrell and Mr. Ortale.

69.     In addition, the agents asked both Mr. Tyrrell and Mr. Ortale whether they would have invested in the Funds had they known their investments were going to support the "CEA Solar Tour," an event apparently sponsored by CEA that travels to concerts around the country promoting clean energy. The clear suggestion of these questions was that money invested in the Funds had gone to such a purpose.

70.     During the course of these interviews, and in subsequent discussions with counsel, the FBI agents also stated that other investors in the Funds had been successful in requesting that their interests in the Funds be redeemed. The FBI agents suggested that both Mr. Tyrrell and Mr. Ortale should make the same request.

71.     Plaintiffs began a coordinated effort to seek a redemption of their investments in the Funds from Mr. Warren and CEA, as a result of these serious developments.

## 2. Subsequent Communications with Warren, Hill and Vitale

72.  In early June 2017, in an effort to secure the return of the money Plaintiffs' had purportedly "invested" in the fraudulent Funds, Mr. Tyrrell began communicating with Mr. Warren regarding redemptions of the Plaintiffs' investments.

73.  On June 9, 2017, Mr. Tyrell emailed Mr. Warren and advised that a redemption needed to be done soon. Mr. Warren responded, advising that "the deal is done," and that he expected all transactions to be closed by June 30, 2017. Following a request for clarification as to what "the deal" entailed, Mr. Warren advised that the Plaintiffs would receive a return of original capital and interest through July 15, 2017, as well as an additional amount to cover funds the government may seek to recapture by way of the investment tax credits the Plaintiffs claimed as a result of their investment in the Funds. A true and accurate copy of the June 9, 2017 email is attached to the accompanying Evidentiary Appendix as **Exhibit 16.**

74.  On June 22, 2017, Mr. Warren emailed Mr. Ortale advising that an "interested party" would be purchasing all outstanding shares of Solar IV and UIF, and that the closing of the transaction should take place within the next seven to ten days. Mr. Warren asked that the Plaintiffs execute redemption authorization forms and return them via email so that he could process the redemption. A true and accurate copy of the June 22, 2017 email is attached to the accompanying Evidentiary Appendix as **Exhibit 17.**

75.  Each of the Plaintiffs executed the redemption authorization forms and returned them to Mr. Warren. A true and accurate copy of the redemption authorization forms are attached to the accompanying Evidentiary Appendix as collective **Exhibit 18.**

76.  Over the course of the next six weeks, through the middle of August 2017, Mr. Warren continued to email Plaintiffs, providing excuses as to why the redemptions had not been

paid. A true and accurate copy of the continuing email communications are attached to the accompanying Evidentiary Appendix as collective **Exhibit 19**. As of the date of filing this Complaint the Plaintiffs have not received a redemption.

77.     In addition to the failure of Mr. Warren, CEA, and the Funds to redeem Plaintiffs' investments, as promised, the Funds also failed to make timely 2017 second quarter distributions to the Plaintiffs. Those distributions were due on July 15, 2017.  They were not paid to Mr. Ortale, the PBO Trust, or Mr. Hopper until August 1, 2017. The remaining Plaintiffs, those under the control of Mr. Tyrrell, never received second quarter distributions.

78.     On August 21, 2017, in an effort to find out what he knew about Mr. Warren and the status of the investments in the Funds, Mr. Tyrrell called Mike Zito, a sales person associated with CEA.  Mr. Zito told Mr. Tyrrell that he had wanted to contact him for some time, but also seemed very nervous on the phone.  Throughout the course of the call, Zito indicated many times that he wanted to meet in person and not talk about these issues on the phone.

79.     Mr. Zito told Mr. Tyrrell that he was no longer employed by CEA, and had left over the "transparency, communication, and direction of the company."  He stated that nothing was ever provided to him by Mr. Warren or CEA "in complete detail."  He went on to say that the biggest question in his mind was how many investors actually participated in the Funds and how much money was really invested in them.

80.     When Mr. Tyrrell asked him whether Mr. Warren could be trusted, Mr. Zito stated that his "answer on the phone was yes" but that he wanted to talk to Mr. Tyrrell in person about that very issue. The Plaintiffs never had the opportunity to speak with Mr. Zito in person, however.  After setting a time to meet, and canceling it, Mr. Tyrrell was contacted by a lawyer for Mr. Zito.

81.     At first, this lawyer requested a waiver for Mr. Zito before any further conversation between him and Mr. Tyrrell took place. After negotiating such a waiver, Mr. Zito's lawyer informed the undersigned counsel that he had spoken to an FBI agent, with whom he had been in contact with for some time concerning Mr. Zito's employment at CEA. Mr. Zito's lawyer stated that he had been told it would not be in Mr. Zito's interest to have any further communication with Plaintiffs.

82.     On August 29, 2017, in a continuing effort to learn information about Mr. Warren and the status of Plaintiffs' investments in the Funds, counsel for plaintiffs spoke with Mr. Hill, who was not represented at the time.  He stated that he was no longer employed by CEA, that Mr. Warren had closed CEA at the end of July, and that CEA was no longer an active company.

83.     Mr. Hill further stated that he was not actually the Chief Business Development Officer of CEA, and in fact Mr. Warren made all management decisions related to CEA and the Funds.  This is contrary to the representations in the UIF POM which states that Mr. Hill is the Chief Business Development Officer of CEA.

84.     Mr. Hill also stated that his only role at CEA was trying to sign up investors in the Funds, and that Mr. Warren had provided him with a "story he could tell" in order to do so.

85.     On September 1, 2017, counsel received a voicemail from Mr. Vitale in response to repeated attempts to contact him.  In that voicemail Mr. Vitale stated that, just like Mr. Hill, and despite his title and position as represented in the UIF POM, he had no management oversight over CEA or the Funds, and was "really a marketing guy" and "went out and told the story."

86.     Based on the foregoing information the Plaintiffs have learned in the past five months, CEA and the Funds never constructed, nor had any intention to construct, any utility scale solar PV projects for which the Plaintiffs contributed funds.

87.     Instead, the investment funds were used for other purposes including, on information and belief, the "CEA Solar Tour," or to enrich Mr. Warren, Mr. Hill, Mr. Vitale and other unknown third parties.

88.     Upon further information and belief, the Plaintiffs' funds were commingled with other funds owned, operated, or managed by CEA.

89.     Plaintiffs relied on the statements made to them by the Defendants, and in the POMs and other documents provided by the Defendants, in making their decisions to invest in the Funds.  Plaintiffs would never had invested in the Funds had they known what the Defendants were truly doing with the money they solicited from Plaintiffs.

90.     Defendants collected millions of dollars on behalf of CEA based on numerous representations that those funds would be used to complete and equip numerous utility scale solar PV projects, which would then enter into long term power purchase contracts with various utilities.   Despite these numerous representations, Defendants took no such actions, and intentionally failed to complete or equip any utility scale solar PV projects, and, upon information and belief, commingled Plaintiffs' funds with other funds maintained by CEA. These actions, among other things, constitute fraud.

91.     Further, CEA's failure to provide the audit information demanded is in violation of applicable Tennessee law, the POMs, and the UIF LLC operating agreement.

92.     On information and belief, Defendant CEA, at the direction of Mr. Warren, has ceased operation as of the end of July 2017.  Despite ceasing operation, Plaintiffs interest in the

Funds have not been redeemed, nor have Plaintiffs been provided with any information about the status of location of the monies they invested in the Funds.

93.     The Plaintiffs have demanded, and Mr. Warren and CEA have offered, a full redemption of Plaintiffs' investments in the Funds.  Despite executing the required documents to redeem their interests, and despite repeated promises from Mr. Warren that such a redemption would be forthcoming, the Plaintiffs have not been redeemed as of the date of this Complaint.

94.     On information and belief, Mr. Warren, CEA, and the other Defendants are continuing to diminish and waste assets that are in fact the property of Plaintiffs and/or must be used to redeem Plaintiffs' investments in the Funds.  As a result Plaintiffs are at risk of immediate and irreparable harm of not recovering the money that they were fraudulently induced to place in the Defendants' control.

### COUNT I
**Violation of Section 10(b) of the Exchange Act,
15 U.S.C. § 78j, and Rule 10-b-5 Against all Defendants**

95.     The Plaintiffs incorporate Paragraphs 1 through 94 as if fully set forth herein.

96.     Defendants are persons or entities who were directly involved in connection with the securities offering and sales activities of CEA and/or the Funds.

97.     Defendants acted with intentional or reckless disregard of the activities of the Funds.

98.     Defendants intentionally misrepresented and/or acted with reckless disregard of the truth of representations and statements made in the POMs and other sales materials for the Funds.

99.     Defendants intentionally misrepresented and/or omitted facts that were material to Plaintiffs' decisions to invest in the Funds.

4840-4710-0751.6

100.    The Defendants participated in or had supervisory responsibilities with respect to the POMs and Offerings which contained the material omissions and misrepresentations detailed in this Complaint, or recklessly disregarded their fiduciary obligations to supervise the activities of CEA and the Funds.

101.    As set forth above, the POMs and sales materials were materially misleading because, *inter alia*, they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    The Defendants violated § 10(b) of the Securities Exchange Act and Rule 10b-5 by engaging in the conduct set forth in this Complaint, either directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mail, with *scienter*.  To do so, Defendants:

    a.  Employed devices, schemes and artifices to defraud;

    b.  Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.  Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Plaintiffs in connection with their investments in the Funds.

103.    In reliance on the POMs and Defendants' statements in their sales materials and communications, Plaintiffs invested in the Funds.  Plaintiffs would not have invested in the Funds had they been aware of the material omissions and misrepresentations.  As a result of their investment in the Funds, Plaintiffs have been damaged.

104.    The Defendants are liable for the Plaintiffs' damages caused by the Defendants' violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 in an amount to be proven at trial.

## COUNT TWO
### Violation of Section 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78t
### Against Defendants Chris Warren, Scott Hill, and Jack Vitale

105.    The Plaintiffs incorporate Paragraphs 1 through 104 as if fully set forth herein.

106.    During various times relevant to this Complaint, Defendants Mr. Warren, Mr. Hill, and Mr. Vitale (the "named Defendants") were controlling persons within the meaning of the Exchange Act by virtue of their positions as officers, directors, and/or controlling stockholders in CEA and the Funds.

107.    Each of the named Defendants possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of CEA and the Funds, particularly the furtherance of the conspiracy and scheme of the named Defendants to defraud the Plaintiffs (in which each of the named Defendants culpably participated).

108.    As a direct and proximate result of the wrongful conduct of the named Defendants, the Plaintiffs suffered damages in connection with their investment in the Funds. The Plaintiffs would not have invested in the Funds had they been aware of the material omissions and misrepresentations.

109.    By reason of such wrongful conduct, these Defendants are liable pursuant to  § 20(a) of the Securities Act, 15 U.S.C. § 78*t*, in an amount to be proven at trial.

## COUNT THREE
### Violation of Section 15 of the Securities Act, 15 U.S.C. §§ 77o
### Against Defendants Chris Warren, Scott Hill, and Jack Vitale

110.    The Plaintiffs incorporate Paragraphs 1 through 109 as if fully set forth herein.

111.     During various times relevant to the transactions in this Complaint, the named

Defendants were controlling persons within the meaning of the Act by virtue of their positions as

officers, directors, and/or controlling stockholders in CEA and the Funds.

112.     Each of the named Defendants possessed, directly or indirectly, the power to

direct or cause the direction of the management and policies of CEA and the Funds, particularly

the furtherance of the conspiracy and scheme of the named Defendants to defraud the Plaintiffs

(in which each of the named Defendants culpably participated).

113.     As a direct and proximate result of the wrongful conduct of the named

Defendants, the Plaintiffs suffered damages in connection with their investment in the Funds.

The Plaintiffs would not have invested in the Funds had they been aware of the material

omissions and misrepresentations.

114.     By reason of such wrongful conduct, these Defendants are liable pursuant to  §

20(a) of the Securities Act, 15 U.S.C. § 77o, in an amount to be proven at trial.

## <u>COUNT FOUR</u>
### Violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77*l*(a)(2)
### Against all Defendants

115.     The Plaintiffs incorporate Paragraphs 1 through 114 as if fully set forth herein.

116.     In connection with the offer and sale of interests in the Funds, by the use of means

or instruments of transportation or communication in interstate commerce or of the mail, the

Defendants distributed POMs and made oral and written communications that included untrue

statements of material fact and omitted to state material facts necessary to make the statements,

in light of the circumstances under which they were made, not misleading.

117.     Without     knowledge     of     the     Defendants'     material     omissions     and

misrepresentations, the Plaintiffs invested in the Funds.

118.     The Defendants are liable for the Plaintiffs' damages caused by the violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), in an amount to be determined at trial.

**COUNT FIVE**
**Violation of T.C.A. § 47-18-104**
**Tennessee Consumer Protection Act**
**Against All Defendants**

119.     The Plaintiffs incorporate Paragraphs 1 through 118 as if fully set forth herein.

120.     The Defendants engaged in misleading representations and deceptive practices in the sale investments in the funds to Plaintiffs in violation of the Tennessee Consumer Protection Act (or, in the alternative, the state counterparts under the laws of any other states which may apply in this matter).

121.     The Defendants advertised the Funds as an investment in utility scale solar PV projects, with the intent not to ever construct such PV projects.

122.     The Defendants' wrongful conduct directly and proximately caused damages to the Plaintiffs.

123.     The Defendants are liable to the Plaintiffs for actual, and up to treble, damages together with costs and attorney's fees for their violations of the Tennessee Consumer Protection Act.

**COUNT SIX**
**Violation of Tennessee Securities Act, Tennessee Code Ann. § 48-1-122 Based on**
**Breach of Tennessee Code Ann. § 48-1-121(a) Against All Defendants**

124.     The Plaintiffs incorporate Paragraphs 1 through 123 as if fully set forth herein.

125.     The Tennessee Securities Act of 1980 is applicable to the securities offered to and purchased by the Plaintiffs, as all are residents of Tennessee.

126.    In connection with the offer and sale of the interests in the Funds, the Defendants employed devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business that operated as a fraud and deceit, all in violation of the Tenn. Code. Ann. §48-1-121(a).

127.    The Plaintiffs reasonably relied upon the Defendants' representations, as set forth in this Complaint, and were unaware of the true facts.  In reliance upon the Defendants' representations, the Plaintiffs invested in the Funds from the Defendants in Tennessee.  The Plaintiffs would not have invested in the Funds had they been aware of Defendants' material omissions and misrepresentations.

128.    The Defendants' wrongful conduct directly and proximately caused damages to the Plaintiffs.

129.    The Defendants are therefore liable to the Plaintiffs for such damages as may be determined at trial, plus expenses, interest and attorneys' fees, as provided in Tenn. Code Ann. § 48-1-122.

## COUNT SEVEN
### Common Law Fraud
### Against All Defendants

130.    The Plaintiffs incorporate Paragraphs 1 through 129 as if fully set forth herein.

131.    By and through the Offerings, the Defendants intentionally orchestrated and executed a scheme to defraud and deprive the Plaintiffs of money by selling investments in the Funds to the Plaintiffs under the guise that the investments would be used to construct and operate multiple utility scale solar PV projects, which were never constructed.

4840-4710-0751.6

25

132. The Defendants used the POMs, the sales materials and other oral and written communications to execute the fraudulent scheme by creating the appearance that the information communicated in the Offerings by the Defendants was legally and factually true and complete.

133. The Defendants solicited investments in the funds from the Plaintiffs by knowingly making misrepresentations of material facts and by omitting to disclose facts that were material to the Plaintiffs' decisions to invest in the Funds, as set forth in this Complaint.

134. The Plaintiffs reasonably relied on the above-referenced misrepresentations and sustained damages as a proximate result of the Defendants' conduct.

135. The Plaintiffs are entitled to recover consequential damages, plus prejudgment interest, in an amount to be proven at trial.

136. Because the Defendants' actions were intentional, malicious and/or willful, the Plaintiffs are entitled to punitive damages.

## COUNT EIGHT
### Equitable Fraud
### Against All Defendants

137. The Plaintiffs incorporate Paragraphs 1 through 136 as if fully set forth herein.

138. By and through the Offerings, the Defendants intentionally orchestrated and executed a scheme to defraud and deprive the Plaintiffs of money by selling investments in the Funds to the Plaintiffs under the guise that the investments would be used to construct and operate multiple utility scale solar PV projects, which were never constructed.

139. The Defendants used the POMs, the sales materials and other oral and written communications to execute the fraudulent scheme by creating the appearance that the

information communicated in the Offerings by the Defendants was legally and factually true and complete.

140. The Defendants sold the interests in the Funds to the Plaintiffs by knowingly making misrepresentations of material facts and by omitting to disclose facts that were material to the Plaintiffs' decisions to invest in the Funds, as set forth in this Complaint.

141. The Plaintiffs reasonably relied on the above-referenced misrepresentations and sustained damages as a proximate result of the Defendants' conduct.

142. The Plaintiffs are entitled to recover consequential damages, plus prejudgment interest, in an amount to be proven at trial.

143. Because the Defendants' actions were intentional, malicious and/or willful, the Plaintiffs are entitled to punitive damages.

## COUNT NINE
### Breach of Fiduciary Duty
### Against All Defendants

144. The Plaintiffs incorporate Paragraphs 1 through 143 as if fully set forth herein.

145. CEA was the Managing Member of UIF and the General Partner of Solar IV, and the other Defendants occupied positions of control and fiduciary responsibility in relation to the Plaintiffs and their investments in the Funds.

146. The Defendants breached their fiduciary duties to the Plaintiffs by failure to ensure the proper accounting and use of monies provided by Plaintiffs pursuant to the Offerings.

147. The relationships between the Defendants and the Plaintiffs were fiduciary relationships of trust and confidence. The Defendants had the duty to the Plaintiffs to exercise the utmost care, good faith and honesty with respect to the Funds and the Plaintiffs.

148.    The Plaintiffs were damaged as a proximate result of the Defendants' breaches of fiduciary duty.

149.    The Defendants are liable to the Plaintiffs for all the losses the Plaintiffs sustained by virtue of their investments in the Funds, plus pre-judgment interest, in an amount to be proven at trial.

150.    Because the Defendants' actions were intentional, malicious and/or willful, the Plaintiffs are entitled to punitive damages.

## COUNT TEN
### Conversion
### Against All Defendants

151.    The Plaintiffs incorporate Paragraphs 1 through 150 as if fully set forth herein.

152.    The Defendants have wrongfully and intentionally exercised and have conspired to exercise dominion and control over monies and funds provided by Plaintiffs for the construction and operation of multiple utility scale solar photovoltaic projects.

153.    The utility scale solar photovoltaic projects were never constructed.

154.    Defendants' actions amount to conversion of the Plaintiffs' funds.

155.    As a direct and proximate result of the tortious acts of Defendants, the Plaintiffs are entitled to damages in an amount to be determined at trial.

156.    Because of Defendants' willful conversion of the Plaintiffs' property, the Plaintiffs are entitled to recover punitive damages from Defendants in an amount to be determined at trial.

## COUNT ELEVEN
### Constructive Trust
### Against All Defendants

157.    The Plaintiffs incorporate Paragraphs 1 through 156 as if fully set forth herein.

158.     CEA and the Defendants occupied positions of trust and confidence as to the Plaintiffs and therefore were bound to abstain from any acts which would act as a detriment to the Plaintiffs.

159.     Through the actions set forth in this Complaint, the Defendants have unjustly enriched themselves at the expense of the Plaintiffs.

160.     The various personal and business bank accounts and other repositories of money and other assets possessed, currently owned and/or controlled by the Defendants have been used to receive and conceal the monies which should have been used to further the business goals of the Funds for the benefit of the Plaintiffs.

161.     The investment monies which CEA received were improperly diverted by its officers and principals and those persons and entities controlling them, and together with the proceeds or products thereof, constitute the *res* of a constructive trust.  The Defendants are therefore obligated to return the money that was improperly utilized or withdrawn from CEA to prevent their unjust enrichment.

162.     The converted money received by CEA through the Offerings is known and identifiable.  At the present time, however, the repositories of all the proceeds and the use of such proceeds have not been completely identified.  Therefore, the Plaintiffs are entitled to an accounting of the assets of the Defendants.

163.     As a result of Defendants' wrongful retention of the Plaintiffs' investment funds, the Plaintiffs have suffered immediate and irreparable injury and will continue to suffer in violation of their rights unless the assets, whatever their present form, representing, in whole or in part, funds converted by the Defendants, are immediately frozen by Order of this Court.  Since there is a strong likelihood that the funds would dissipate if this Court does not grant the

Plaintiffs their requested injunctive relief, the Plaintiffs have no adequate remedy at law or otherwise to address this injury, save in a court of equity.

164. The Plaintiffs are the beneficial and equitable owners of the trust *res* and are entitled to its immediate possession, as a measure of damages, including all of its proceeds.

**COUNT TWELVE**
**An Accounting**

165. The Plaintiffs incorporate Paragraphs 1 through 164 as if fully set forth herein.

166. Due to the wrongful conduct and acts of the Defendants, the Plaintiffs request the Court to order an accounting and complete examination of the books and records, and financial accounts of all Defendants, including specifically an accounting for the monies assessed to construct and operate multiple utility scale solar photovoltaic projects that were not so used.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment as follows:

A. Rescission of the investments in the Funds, together with interest from the date of Plaintiffs' investment in the Funds;

B. An award of recessionary and consequential damages in an amount to be determined at trial;

C. An award of actual and up to treble damages, together with costs and attorneys' fees as to the claims for violations of the Tennessee Consumer Protection Act (or any applicable out-of-state counterpart);

C. An award of punitive damages;

D. Imposition of a constructive trust upon the assets of the Defendants;

E. An award of costs and reasonable attorneys' fees;

F. An accounting as requested pursuant to the Twelfth Cause of Action herein;

G.      Provide such other relief as the Court deems to be just and proper.

## **JURY DEMAND**

The Plaintiffs demand a trial by jury.


Dated: September 13, 2017          s/ John-David H. Thomas
                                     John-David H. Thomas (TN BPR No. 027582)
                                     Kevin T. Elkins (TN BPR No. 033280)
                                     WALLER LANSDEN DORTCH & DAVIS, LLP
                                     Nashville City Center
                                     511 Union Street, Suite 2700
                                     Nashville, TN 37219
                                     Tel: (615) 244-6380
                                     Fax: (615) 244-6804
                                     JD.Thomas@wallerlaw.com
                                     Kevin.Elkins@wallerlaw.com

                                     *Attorneys for Plaintiffs*

4840-4710-0751.6

31